# Exhibit 09

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**MIDLAND/ODESSA DIVISION**

| | |
|---|---|
| CLAIRPATH, LLC,<br><br>*Plaintiff and Counterclaim Defendant,*<br><br>v.<br><br>APPLE INC.,<br><br>*Defendant and Counterclaim Plaintiff.* | Case No. 7:26-cv-00015 |

**REPLY DECLARATION OF DR. BENJAMIN B. BEDERSON REGARDING CLAIM CONSTRUCTION**

I declare under penalty of perjury under the laws of the United States that the following is true and correct.

Executed this 21st day of September 2026 in Windsor, MA

By: ______________________
Dr. Benjamin B. Bederson

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION ..... 1

II. QUALIFICATIONS ..... 2

III. LEGAL STANDARDS ..... 5

IV. OVERVIEW OF THE ’948 PATENT ..... 10

V. OVERVIEW OF THE ’708 PATENT ..... 10

VI. PERSON HAVING ORDINARY SKILL IN THE ART ..... 10

VII. OPINIONS ON DISPUTED CLAIM TERMS ..... 12

- A. “control module” (’948 patent, claims 1, 3, 5, 6); “output module” (’948 patent, claim 1, 3, 4, 5, 6, 7, 8); and “communication module transmitting/receiving messenger information” (’948 patent, claim 1) ..... 12
- B. “screen division function” (’948 patent, claim 7) / “dividing a screen of the navigation device” (’948 patent, claim 12) ..... 22

VIII. CONCLUSION ..... 27

I, Benjamin B. Bederson, declare as follows:

## I. INTRODUCTION

1. I previously submitted a Declaration Regarding Claim Construction (the "Opening Declaration") in support of Defendant Apple Inc.'s ("Apple") Opening Claim Construction Brief in this matter, dated August 17, 2026. I incorporate by reference the entirety of my Opening Declaration, including my qualifications, the materials I reviewed, and the legal standards I described therein.

2. I have now been asked by counsel for Apple to review Clairpath, LLC's ("Clairpath") Response Claim Construction Brief (the "Response Brief") and the Declaration of Dr. John P. Conte (the "Conte Declaration") submitted in support thereof, and to provide reply opinions regarding the claim construction of U.S. Patent Nos. 8,483,948 (the "'948 patent") and 8,996,708 (the "'708 patent," collectively the "Asserted Patents").

3. In preparing this Reply Declaration, I have reviewed the following additional materials: (a) Clairpath's Response Claim Construction Brief; (b) the Declaration of Dr. John P. Conte; (c) the exhibits attached to Clairpath's Response Brief, including Exhibit H (the Wiley Electrical and Electronics Engineering Dictionary (2004) definition of "module"); (d) the Non-Final Office Action dated May 10, 2012; (e) the Amendment dated November 9, 2012; and (f) the Final Office Action dated December 3, 2012.

4. My opinions are based on my review of the intrinsic record of the Asserted Patents, the documents cited in this Declaration, and my experience as detailed in my Opening Declaration and curriculum vitae.

5. I am being compensated at my customary rate of $750 per hour. My compensation is in no way affected by the outcome of this litigation.

## II. QUALIFICATIONS

6. I incorporate by reference the qualifications section recited in my Opening Declaration.

7. In addition, I have worked personally implementing GPS on mobile devices, including using messenger programs for exchanging location data between devices. For example, the 2008 paper[1] I described in my Opening Declaration was built using a mobile device that tracked live location data using GPS. This was illustrated in Figure 3 of that paper.




FIGURE 3 Mobile interface: Simple buttons start and stop recording, labels display position, and map shows route (updating route view only partially implemented).

8. Furthermore, this work was based on my research that I started by at least 2006. I publicly presented a talk with my colleagues, describing it at the 2006 Annual Symposium[2] of the Human-Computer Interaction Lab, which I was the director of at the University of Maryland. That web page lists the talk titled "Mobile Mapping, and Personal Travel History" with a link to

---

[1] Benjamin B. Bederson, Aaron Clamage & Catherine Plaisant, Enhancing In-Car Navigation Systems with Personal Experience, 2064 Transportation Research Record: Journal of the Transportation Research Board 33 (2008). https://journals.sagepub.com/doi/abs/10.3141/2064-06

[2] https://www.cs.umd.edu/hcil/about/events/symposium2006/

the slides we presented at that talk. Those slides show that by 2006, we had built a working prototype that included a GPS receiver that exchanged location data with a PDA device using a messenger program.




Slide 10 from https://www.cs.umd.edu/hcil/about/events/symposium2006/pdfs/aaron.pdf

(retrieved September 16, 2026)

9. In my Opening Declaration, I described my research involving Pad++ including the ability to display maps in multiple windows. That Pad++ system was implemented using spatial indexing algorithms as described in a 1994 paper[3] I wrote. That system used R-trees to

---

[3] Benjamin B. Bederson and James D. Hollan. 1994. Pad++: a zooming graphical interface for exploring alternate interface physics. In Proceedings of the 7th annual ACM symposium on User

implement the spatial index and selectively rendered portions of the scene depending on what was visible in the current view. It also supported fast rendering by tiling the screen to only render the portion of the screen that had changed. It also queried point-of-interest data sources to display areas of interest within a map. As shown in that paper, Pad++ managed viewport management local that independently controlled the pan and zoom state of each map region and included rendering pipeline management to draw two distinct map views simultaneously without visual artifacts. The 2002 paper[4] I described in my Opening Declaration further described the displaying of two maps simultaneously including algorithms for determining whether two geographic locations can be displayed on a single map at a given zoom level, accounting for the current display dimensions and the distance between multiple locations.

10. The Pad++ system further included layout management algorithms to partition the available screen area into separate areas for different content. For example, as described in a 1996 paper[5], Pad++ could layout web pages to subdivide a screen into portions so that pages that were followed from one page were positioned and scaled to the right of the first page so that they fit within a prescribed space as illustrated in the figures from that paper here.

---

interface software and technology (UIST '94). Association for Computing Machinery, New York, NY, USA, 17–26. https://doi.org/10.1145/192426.192435

[4] Hornbæk, K., Bederson, B. B., & Plaisant, C. (2002) Navigation Patterns and Usability of Zoomable User Interfaces With and Without an Overview, ACM Transactions on Computer-Human Interaction, 9 (4), 362-389. https://dl.acm.org/citation.cfm?doid=586081.586086

[5] Benjamin B. Bederson, James D. Hollan, Jason B. Stewart, et al. "Zooming Web browser", Proc. SPIE 2667, Multimedia Computing and Networking 1996, (25 Mar 1996); https://doi.org/10.1117/12.235898



**Figure 1: Snapshot of Pad++ Web Browser.**



**Figure 2: Another view of same web pages.**

11. In my work with Pad++ and subsequent systems, I designed and wrote software myself that communicated over and managed networks, including error handling and retry logic, session management, and synchronization. Furthermore, I designed and implemented numerous file formats to serialize and deserialize objects including numerous kinds of object types and attributes.

## III. LEGAL STANDARDS

12. Within this statement, I apply my understanding of certain legal standards to opine on the scope and meaning of certain disputed claim terms. However, I am neither a lawyer nor an expert in patent law. The following is my understanding of these legal standards.

13. I understand that claim construction is for the court to decide.

14. I understand that the patent claims are the numbered sentences at the end of each patent and define what a patent covers. The figures and text in the rest of the patent provide a description and/or examples of the prior art or the invention and provide a context for the claims, but it is the claims that define the breadth of the patent's coverage. Each claim is effectively

treated as if it were a separate patent, and each claim may cover more or less than another claim. Therefore, what a patent covers depends, in turn, on what each of its claims covers.

15. I understand that the words of a claim are generally given their ordinary and customary meaning, which is the meaning that the term would have to a person of ordinary skill in the art ("POSITA") to which the patent pertains at the time of the invention. I understand that a POSITA is not an expert in the technical field at issue, but has normal skills and knowledge in that technical field.

16. I understand that, in construing terms, courts look first to the intrinsic evidence of record, which includes the patent itself (including the claims and specification) and the prosecution history. I also understand that courts may consider extrinsic evidence, such as expert and inventor testimony, dictionaries, and learned treatises, though courts should consider the intrinsic record first.

17. I understand that intrinsic evidence includes the prosecution history of a patent. The prosecution history of a patent provides the record of the examination of a patent application before the U.S. Patent and Trademark Office ("PTO"). The prosecution history provides evidence of how the patent examiner and the inventor understood the patent application and the claims, and can therefore be instructive on how to interpret the claims. It is my understanding that arguments or amendments made concerning one patent application can be instructive as to the meaning of like terms in another related patent application.

18. I understand that particular embodiments appearing in the written description should not be used to limit claim language that has broader effect. I understand that even where a patent describes only a single embodiment, claims are not to be read restrictively unless the

patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction.

19. I understand that a POSITA is deemed to read the claim term not only in the context of the particular claim in which it appears, but also in the context of the entire patent, including the specification, the other claims, and the prosecution history.

20. I understand that while claim terms are understood in light of the specification, the scope of the claims is not necessarily limited to inventions that look like the ones shown in the figures and described in the specification. I realize that limiting claims from the specification is generally not permitted absent a clear disclosure that the patentee intended the claims to be limited as shown.

21. I understand that the claims in an issued U.S. patent are presumed valid, but that this presumption can be rebutted if it is shown by clear and convincing evidence that the patent claim is invalid.

22. When assessing whether a claim phrase is definite, I understand courts must take into account the inherent limitations of language in often not providing absolute certainty. At the same time, a patent must be precise enough to afford clear notice of what is claimed in order to appraise the public of what remains available. I understand that the degree of precision necessary for adequate claims is a function of the nature of the subject matter, and that absolute precision is not required.

23. I understand that indefiniteness is an invalidity defense, and that a defendant bears the burden to demonstrate a term is indefinite by clear and convincing evidence. I further understand that indefiniteness is a legal question with underlying factual determinations.

24. I understand that a claim is indefinite if, when read in light of the specification and the prosecution history, it fails to inform, with reasonable certainty, persons of ordinary skill in the art about the scope of the invention.

25. I understand that if the meaning of the claim cannot be reasonably understood by a POSITA when read in light of the specification and the prosecution history, the claim is indefinite.

26. I also understand that a claim is indefinite if it is unclear or ambiguous as to what previous claim term a subsequent claim term references. For example, I understand that if two different elements, such as two different levers, are recited in a claim, and a subsequent claim element recites "the lever," that claim is indefinite if it is unclear or ambiguous as to which of the two levers the term "the lever" references.

27. I understand that "An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." 35 U.S.C. §112 ¶ 6.

28. I understand that 35 U.S.C. §112 ¶ 6 gives patent applicants two options: (1) recite, in the claim, a function without reciting structure for performing the function and limit the claims to the structure, materials, or acts disclosed in the specification (or their equivalents), in which case § 112 ¶ 6 applies, or (2) recite both a function and the structure for performing that function in the claim, in which case § 112 ¶ 6 is inapplicable. I understand that limitations that invoke § 112 ¶ 6 are generally known as "means-plus-function" limitations.

29. I understand that the overall means-plus-function analysis is a two-step process. The first step is to determine whether a claim limitation is drafted in means-plus-function format,

which requires courts to construe the limitation to determine whether it connotes sufficiently definite structure to a POSITA. If the limitation connotes sufficiently definite structure, it is not drafted in means-plus-function format, and 35 U.S.C. § 112 ¶ 6 does not apply. If, however, courts conclude that the limitation is in means-plus-function format, they perform the second step of determining what structure, if any, disclosed in the specification corresponds to the claimed function.

30. I understand that courts presume at the first step of the analysis that a claim limitation is subject to § 112 ¶ 6 when the claim language includes the term "means." I understand that the inverse is also true—courts presume that a claim limitation is not drafted in means-plus-function format in the absence of the term "means." I also understand, however, that this presumption is rebuttable. The presumption can be overcome if a challenger demonstrates that the claim term fails to recite sufficiently definite structure. Nonce words that reflect nothing more than verbal constructs may be used in a claim in a manner that is tantamount to using the word means, and can invoke § 112 ¶ 6. I understand the essential inquiry is not merely the presence or absence of the word "means," but whether the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure.

31. I understand that construction of a means-plus-function limitation includes two steps. First, the court must determine the claimed function. Second, the court must identify the corresponding structure in the written description of the patent that performs the function. I understand that a structure disclosed in the specification qualifies as a corresponding structure if the specification or the prosecution history clearly links or associates that structure to the function recited in the claim. I understand that when the specification fails to identify sufficient

structure for performing the claimed function, the means-plus-function limitation lacks any discernible scope, and the claim is invalid for indefiniteness.

32. I understand that in a means-plus-function claim in which the disclosed structure is a computer or microprocessor programmed to carry out an algorithm, the disclosed structure is a special purpose computer programmed to perform the disclosed algorithm. I understand that in the case of such computer-implemented functions, it is required that the specification disclose an algorithm for performing the claimed function. I understand that the specification can express the algorithm in any understandable terms including as a mathematical formula, in prose, as a flow chart, or in any other manner that provides sufficient structure.

## IV. OVERVIEW OF THE ’948 PATENT

33. The ’948 patent describes a navigation system and method whereby a “navigation device” exchanges “location information” with other navigation devices via a messenger program installed on the device. ’948 patent at 1:14-19. The location information is then mapped and displayed on the navigation device. *Id.* at 5:5-20, Fig. 2.

## V. OVERVIEW OF THE ’708 PATENT

34. The ’708 patent describes a navigation system and method of providing “content information” using two devices, “a wireless communication device and a navigation device.” ’708 patent at 1:17-23. The claimed navigation device receives the content information through the wireless communication device and “provid[es] the content information to a user….” *Id.* The received content information is then displayed by the navigation device. *Id.* 5:10-14, Fig. 1.

## VI. PERSON HAVING ORDINARY SKILL IN THE ART

35. A POSITA would have had at least a bachelor’s degree in electrical engineering or computer science (or an equivalent degree), and one or two years of experience working in the field of navigation systems and devices or in a similar field. Additional industry experience or

technical training may offset less formal education, while advanced degrees or additional formal education may offset lesser levels of industry experience.

36. Dr. Conte adds "the field of global positioning system implementation" to his POSITA definition. Conte Decl. ¶ 29. He defines a POSITA as having "at least one to two years of experience in the field of global positioning system implementation, navigation systems and devices, or in a similar field." *Id.*

37. A POSITA would not need experience implementing GPS systems to work in the field of the Asserted Patents. The Asserted Patents are directed to navigation systems that use GPS-generated location information, not to building or implementing GPS systems themselves. At most, the accused devices use GPS-based location information; the patents concern the exchange and display of that information, not the design or implementation of GPS infrastructure.

38. If "implementation" is read narrowly to mean working with devices that incorporate or use GPS data, such as navigation devices that use GPS coordinates, the distinction may be immaterial. But to the extent Dr. Conte's definition suggests that a POSITA must have experience designing or building GPS systems, it is overly broad and unsupported by the intrinsic record.

## VII. BACKGROUND ON COMPUTER NAVIGATION TECHNOLOGY

39. Dr. Conte improperly injects a validity argument into his claim construction declaration. *See* Conte Decl. ¶ 31. Validity analysis has no bearing on claim construction.

40. Even if relevant, Dr. Conte's argument is demonstrably wrong. As I explained in my Opening Declaration and further explain here, my work on software systems for exchanging and displaying location-related information predates the priority date of the '948 patent. Op. Decl. at ¶¶ 5-30.

41. Before the 2006 priority date, I personally used messaging applications available in the early-to-mid 2000s to exchange geographic and location-based data with colleagues, including location coordinates and driving-route information. I did so in connection with my research on in-car navigation systems and mapping applications, including the research underlying the in-car navigation paper discussed in my Opening Declaration. Thus, Dr. Conte's assertion that such exchange was not known at the relevant time is inconsistent with my own pre-priority-date experience.

## VIII. OPINIONS ON DISPUTED CLAIM TERMS

42. I have been asked to provide reply opinions as to the terms and issues identified below and the claims associated with those terms. The following is a summary of my reply opinions. My detailed analysis and reasoning are set forth in the sections that follow.

### A. "control module" ('948 patent, claims 1, 3, 5, 6); "output module" ('948 patent, claim 1, 3, 4, 5, 6, 7, 8); and "communication module transmitting/receiving messenger information" ('948 patent, claim 1)

43. It is my opinion that "control module," "output module," and "communication module transmitting/receiving messenger information" should be construed as means-plus-function terms according to § 112 ¶ 6 because those claim terms do not recite sufficiently definite structure for performing the functions recited in the claims. It is also my opinion that each "module" term renders the claims indefinite because the specification fails to disclose adequate structure to perform the claimed functions.

44. Dr. Conte's opinions do not alter my opinion.

45. ***First***, the Wiley dictionary definition of "module" cited by Dr. Conte does not change my opinion that the "module" terms are subject to § 112 ¶ 6. The definition is generic and functional, covering everything from a hardware circuit board to a software component. It does

not tell a POSITA what specific structure any of the claimed modules comprises in the context of the ’948 patent.

46. Dr. Conte cites a definition of “module” from the Wiley Electrical and Electronics Engineering Dictionary (2004), which defines “module” as “[a] self-contained, and usually standardized, unit that performs one or more tasks, and which can be incorporated into a complete system.” Response Brief Exhibit H; Conte Declaration ¶ 34. Dr. Conte contends that this definition demonstrates that “module” connotes sufficient structure to a POSITA. I have reviewed this dictionary definition, and it is unpersuasive regarding Dr. Conte’s opinion.

47. To the contrary, the Wiley dictionary definition confirms my opinion that “module” is a generic, functional term. The definition describes a module as “a unit that performs one or more tasks.” This is a *functional* description—it describes what a module *does* (performs tasks), not what it *is* structurally. The definition encompasses any unit, whether hardware or software, that performs any task. A POSITA reading this definition would understand it to cover a broad range of components, from a removable circuit board to a software subroutine to a firmware block.

48. The example given in the Wiley definition—“a circuit board with standardized dimensions and leads”—is a hardware example that is plainly inapplicable to the software-centric modules claimed in the ’948 patent. None of the claimed “control module,” “output module,” or “communication module” is described in the ’948 patent as a removable circuit board with standardized dimensions and leads. The specification never describes any of the claimed modules as physical, removable hardware components.

49. Moreover, the Wiley definition does not tell a POSITA what *specific* structure the “control module,” “output module,” or “communication module” comprises in the context of the

’948 patent. The definition is agnostic as to whether the “module” is implemented in hardware, software, firmware, or some combination. It provides no information about the internal architecture, algorithms, data structures, or physical components that would enable a POSITA to understand the structural scope of any particular “module” claim term. A POSITA reading the ’948 patent claims considering this definition would not understand what specific structure performs the numerous claimed functions.

50. The Wiley definition provides a generic description that applies to any functional component, but it does not identify any specific structure that a POSITA would associate with the particular “control module,” “output module,” or “communication module” of the ’948 patent.

51. Even if “module” can imply a self-contained unit, that is only one of several possible meanings, and Dr. Conte’s definition remains inadequate for the reasons set forth below.

52. First, Dr. Conte’s definition does not specify whether “module” refers to hardware, software, or a combination of the two. A POSITA reading it would not know whether a “module” in the context of the ’948 patent is a physical circuit board, a software routine, or a firmware component.

53. Second, the definition states that a module is “usually” standardized. This hedged language does not identify a particular structure. A term that “usually” has a characteristic is not always characterized by that feature, and a POSITA cannot determine from the definition whether any given “module” is standardized.

54. Third, the definition refers to a module being disconnected and removed as a single unit and replaced by an equivalent but does not explain what happens when a component is not replaceable. It leaves unanswered whether a component ceases to be a “module” when it cannot be replaced.

55. Most critically, Dr. Conte does not explain how a functionally defined "module" performs any of the claimed functions, such as map retrieval and map matching, without additional programming or customization. Merely identifying a component as a "module" tells a POSITA nothing about how that component performs the specific, complex operations claimed in the '948 patent. The definition therefore does not demonstrate adequate corresponding structure under the applicable standard.

56. ***Second***, the "device" to "module" amendment during prosecution does not alter my opinion.

57. Dr. Conte relies on the '948 patent prosecution history because the applicant amended the claims during prosecution to replace "device" with "module" to overcome an indefiniteness rejection under 35 U.S.C. § 112 ¶ 2, and the Examiner withdrew the rejection. *See* Conte Decl. ¶ 36; Non-Final Office Action (May 10, 2012); Amendment (November 9, 2012); Final Office Action (December 3, 2012). I have reviewed these prosecution history documents and they do not change my conclusion.

58. The amendment from "device" to "module" does not identify any specific structure. The applicant merely substituted one generic term for another. The word "device" is no more structurally specific than the word "module." Both are generic placeholders that describe functional units without specifying their internal structure, architecture, or implementation. Replacing one generic term with another does not imbue the replacement term with structural meaning.

59. Dr. Conte points to the applicant's statement during prosecution that the amendments were made "to clearly set forth the structure of the system which carries out the described functions . . . as shown in Fig. 1." Conte Decl. ¶ 36. But this statement does not itself

disclose any structure. It merely references Figure 1, which, as I opined in my Opening Declaration, shows only functionally labeled boxes with nondescript connections. *See* Opening Declaration ¶¶ 59, 71, 84. A blanket assertion of "set[ting] forth structure" is not sufficient for a POSITA to understand "module" to have a sufficiently definite meaning. The applicant's characterization of its own amendment does not change the fact that Figure 1 depicts nothing more than functional boxes with nondescript connections.

60. Nothing in the portions of the prosecution history relied upon by Dr. Conte identifies any specific hardware, software architecture, or algorithm for the claimed modules. It simply confirms that the applicant replaced one generic term with another and asserted, without elaboration, that the new term "set forth structure" by reference to a figure that shows nothing more than labeled boxes. This does not undermine my conclusion that the "module" terms are subject to § 112 ¶ 6 and that the specification fails to disclose adequate corresponding structure.

61. ***Third***, Dr. Conte opines that the Examiner "mapped the claimed . . . module[s] to specific structural components disclosed in the prior art" in the Final Office Action dated December 3, 2012, identifying display 28, surveillance device 30, and traffic application 34 in Shafaat (U.S. Patent Application Publication No. 2009/0157287) as corresponding to the claimed modules. Conte Declaration ¶ 38. I have reviewed the Final Office Action and Shafaat, and this argument is unpersuasive.

62. The prior art elements that the Examiner cited, a "display," a "surveillance device," and a "traffic application," are themselves described at a high level of generality. A "display" is a generic output component. A "surveillance device" is a functional description of a device used for surveillance. A "traffic application" is a software application described only by its general purpose. None of these identifications establishes that the claimed "control module,"

"output module," or "communication module" has a specific, well-understood structural meaning in the art. To the contrary, the generality of the Examiner's mapping, equating a "module" with another broadly described functional component, underscores that "module" is a generic functional placeholder, not a term of structural specificity.

63. ***Fourth***, Dr. Conte opines that the claimed functions can be performed by the claimed modules without special programming. *See* Conte Declaration ¶ 43. In my Opening Declaration, I opined that the claimed functions require a special-purpose computer or special programming on a general-purpose computer. *See* Opening Declaration ¶¶ 63-64 (control module), ¶ 77 (output module), ¶¶ 89-91 (communication module). Dr. Conte's opinion does not alter my analysis. The claimed functions require specialized programming or a specially programmed hardware component, neither of which the '948 patent describes or Dr. Conte identifies.

64. **Control Module.** The claims assign several functions to the "control module," including map-matching (claim 6), setting an alarm region (claim 3), and map retrieval (claim 5). Each of these functions requires specialized algorithms and programming that a general-purpose computer cannot perform without specific instructions.

65. *Map-matching (claim 6).* Map-matching—the process of matching a GPS-derived position to a corresponding location on a road network database—is a well-known computational problem that requires specialized algorithms. I used software myself that performed this in the 1990s. I recall using MapInfo that performed such "geocoding." MapInfo

published a 1997 white paper[6] titled "Spatially Enhancing Business Data with Geocoding Solutions" that described their use of geocoding. In my experience, geocoding was implemented by, for example: (a) comparing raw GPS coordinates against a road network database that stores road geometries as sequences of coordinate pairs; (b) applying geometric algorithms such as point-to-curve distance calculations to identify candidate road segments that are closest to the reported GPS position; (c) resolving ambiguities at intersections and road junctions, where multiple road segments may be approximately equidistant from the GPS position; or (d) interpolating between known road segments to determine the most probable position along a road. A general-purpose computer cannot perform map-matching without specialized algorithms programmed to perform these computational tasks.

66. *Setting an alarm region (claim 3).* Setting an alarm region, and causing the output module to display destination text information when the navigation device enters that region, requires geofencing algorithms. I have implemented numerous algorithms that cause an action when navigating to a new portion of a map in Pad++. In my experience, this process may require, for example: (a) defining boundaries, such rectangles defining an area; (b) implementing geometric containment tests to determine if an object enters the defined region; (c) continuously monitoring the device's current GPS position relative to those defined boundaries by repeatedly evaluating the containment test at a suitable polling rate; or (d) triggering a notification event when the containment test transitions from false to true (*i.e.*, upon entry into the alarm region). These are non-trivial computational operations that require specific programming. A general-

6 https://web.archive.org/web/19970112202655/http://www.mapinfo.com:80/software/library/geocoding_wp.pdf

purpose computer does not inherently know how to define geographic boundaries, test for spatial containment, or trigger location-based alerts.

67. *Map retrieval (claim 5).* Retrieving a map between a received destination and the device's location may require any of the following, which are things I have done myself: (a) spatial indexing algorithms (such as R-trees or quadtrees) to efficiently identify which map data tiles or segments cover the geographic area between two points; (b) tile-based rendering logic that selects and assembles the appropriate pre-rendered or dynamically generated map tiles at the correct zoom level to display the relevant geographic area; (c) coordinate transformation algorithms to convert between the geographic coordinate system (latitude/longitude) and the screen coordinate system (pixels); or (d) database query optimization for geographic data to retrieve relevant road network, point-of-interest, and boundary data within the area of interest. These are non-trivial computational tasks that require specialized programming.

68. **Output Module.** The claims assign several functions to the "output module," including screen division (claim 7), text-to-speech (claim 4), and simultaneous map display (claim 8). Each of these functions requires specialized programming.

69. *Screen division (claim 7).* Supporting a "screen division function" that "simultaneously displays at least one map corresponding to a location of each of at least one navigation device" may require, as I have done myself: (a) layout management algorithms that calculate the display geometry, determining how to partition the available screen area into separate display regions; (b) coordinate mapping algorithms for rendering two separate maps, each with its own center point, zoom level, and visible geographic extent; (c) viewport management logic that independently controls the pan and zoom state of each map region; or (d) rendering pipeline management to draw two distinct map views simultaneously without visual

artifacts. A display screen alone does nothing without software directing these operations. Dr. Conte's suggestion that a touchscreen can perform this function without special programming is incorrect. *See* Conte Decl. ¶ 41. A touchscreen is merely an output device and input sensor; it requires software to determine what to display and how to partition the display area.

70. *Text-to-speech (claim 4).* Outputting destination text information through voice requires text-to-speech ("TTS") processing, which I am familiar with. This may involve, for example: (a) natural language processing to parse and normalize the input text (including abbreviations, numbers, and special characters); (b) grapheme-to-phoneme conversion to determine the phonetic representation of each word; (c) prosody modeling to determine appropriate intonation, stress, and rhythm; or (d) audio waveform synthesis to generate the actual speech audio signal from the phonetic and prosodic representation. Each of these stages requires complex software implementations. A touchscreen cannot output speech without specialized programming. Indeed, a touchscreen has no speaker. The specification identifies the "output module" as including a TTS "function" but provides no algorithm, architecture, or implementation detail for performing TTS.

71. *Simultaneous map display (claim 8).* Displaying two maps simultaneously (as I have done myself)—one for the navigation device's location and one for the other device's location—when the two devices are "too far away to be displayed on the map" together may require, for example: (a) algorithms to determine whether two geographic locations can be displayed on a single map at a given zoom level, accounting for the current display dimensions and the distance between the two locations; (b) threshold calculations to determine when the distance between the two locations exceeds what can be meaningfully displayed on a single map; or (c) the screen-division algorithms described above to divide the screen and render separate

map views when the threshold is exceeded. These determinations require specialized computational logic.

72. **Communication Module.** The claims assign to the "communication module" the function of "transmitting/receiving messenger information including the location information to/from other navigation device," which I have done myself. This function may require, for example: (a) use of a network protocol to establish, maintain, and terminate connections with external networks (*e.g.*, wireless Internet) and with the messenger server; (b) data serialization and deserialization to encode and decode the messenger information, which includes destination information, navigation device location information, destination description information, and communication information, into a format suitable for network transmission; (c) error handling and retry logic to manage connection failures, data corruption, and timeout conditions; (d) session management to associate transmitted and received messages with the correct messenger sessions and navigation devices; or (e) synchronization with the messenger server to ensure that location information updates are transmitted and received in a timely manner. A general-purpose computer connected to a network cannot perform these functions without specific programming that implements the requisite protocols and data handling logic.

73. Dr. Conte's reliance on Figure 4 of the '948 patent (steps S100–S650) does not constitute algorithmic disclosure sufficient to perform any of the functions described above. As I opined in my Opening Declaration, Figure 4 merely restates the claimed functions at a high level of abstraction. *See* Opening Declaration ¶¶ 65, 78, 91. For example, the step labeled "retrieving a map" in Figure 4 is *less* detailed than even the claim language itself, which requires "retriev[ing] a map between the received destination information and the location of the navigation device." '948 patent, cl. 5. Figure 4 provides no implementation detail, no decision logic, no data

structures, and no step-by-step computational procedures. It is a high-level flowchart that simply labels the desired results, not an algorithm that discloses how to achieve them.

74. The technical detail above supplements and reinforces my Opening Declaration opinions at ¶¶ 63-65 (control module), ¶¶ 76-78 (output module), and ¶¶ 88-91 (communication module). Each of the claimed functions for each of the three modules requires specialized programming that goes well beyond what a general-purpose computer can perform without specific algorithmic instructions. The ’948 patent specification does not disclose any such algorithms.

### B. “screen division function” (’948 patent, claim 7) / “dividing a screen of the navigation device” (’948 patent, claim 12)

75. In my Opening Declaration, I opined that “screen division function” should be construed to mean “a function of the output module that splits the display screen into two substantially equal display areas, each displaying a separate map,” and that “dividing a screen of the navigation device” should be construed to mean “splitting the screen of the navigation device into two substantially equal display areas, each displaying a separate map.” Opening Declaration ¶¶ 94-97. I have reviewed Dr. Conte’s contention on these terms, and it does not change my analysis.

76. Figure 3 is the only figure in the ’948 patent that depicts the “screen division function” or “dividing a screen.” There is no other embodiment or example of screen division in the specification. Opening Declaration ¶ 96. There is no figure, no textual passage, and no disclosure of any kind in the ’948 patent that describes, illustrates, or even suggests any screen-division method other than the one depicted in Figure 3—a screen divided into two vertically stacked display areas of substantially equal size, with each area displaying a separate map.

77. Dr. Conte contends that the specification uses "open-ended" language. Conte Decl. ¶ 47. But this argument conflates two different issues: (1) the number of maps displayed, and (2) how the screen is divided. The language Dr. Conte cites—"at least one map"—pertains to the number of maps that may be displayed, not to the method of screen division. The specification consistently describes the screen as being divided into two substantially equal areas when the screen-division function is invoked. The "at least one map" qualifier in the specification reflects that the output module may display one or more maps, but it says nothing about alternative methods of dividing the screen (*e.g.*, into unequal areas, or into more than two regions), and certainly does not provide enough disclosure for a POSITA to reach this conclusion.

78. Dr. Conte opines that claim 7's "at least one map" language shows a POSITA would understand that the screen can be divided into more than two areas. Conte Decl. ¶¶ 47-48. But as Dr. Conte acknowledges, "Claim 7 ties the number of maps to the number of navigation devices" in claim 6 (from which claim 7 depends). *Id.* ¶ 47. Claim 6 references only two navigation devices: a "navigation device" and an "other navigation device." Thus, under Dr. Conte's own reading, claim 7 contemplates displaying maps for two devices, which is exactly what Figure 3 depicts. A POSITA would not have a different understanding.

79. The written description and figures of the '948 patent provide only one way in which screen division is depicted: Figure 3 shows a screen divided into two substantially equal display areas, each displaying a separate map. There is no alternative figure, textual passage, or other disclosure of a different screen-division method. This is not a case in which the patentee described multiple embodiments. It is a case in which only one embodiment exists, leaving no basis in the intrinsic record for a broader reading.

80. For these reasons, Dr. Conte's declaration does not undermine my conclusion that "screen division function" and "dividing a screen of the navigation device" should be construed as "a function of the output module that splits the display screen into two substantially equal display areas, each displaying a separate map," and "splitting the screen of the navigation device into two substantially equal display areas, each displaying a separate map," respectively.

**C. "in response to a content information providing request" ('708 claims 1, 6)**

81. I have reviewed Dr. Conte's opinions regarding the term "in response to a content information providing request" in claims 1 and 6 of the '708 patent. Conte Decl. ¶¶ 49-52. I understand that Apple proposes that the construction of "in response to a content information providing request" is "in response to a user request on the navigation device to provide content information." Dr. Conte opines that Apple's construction is incorrect and that the "user request" does not need to be performed by a "user." Conte Decl. ¶ 49. For the reasons below, I disagree with Dr. Conte and agree with Apple's proposed construction.

82. Dr. Conte opines that a POSITA would understand this term "according to its plain and ordinary meaning" which is "a request for content information, without requiring that the request be made by a user or be made on the navigation device specifically." Conte Decl. ¶ 50. I disagree. The '708 patent repeatedly and consistently describes the "content information providing request" as a user request made on the navigation device. *See* '708 patent at 4:13-22, 5:47-50, 6:10-31, Figs. 4-5. Dr. Conte describes these passages as "only one illustrative example." However, there are no other embodiments in the '708 patent. Given the consistent descriptions in the '708 patent, a POSITA would have understood the "content information providing request" to be a user request.

83. Dr. Conte also opines that the specification uses "content information providing request" in a context unrelated to a user request when describing the server connecting unit.

Conte Decl. ¶ 51. But the passage Dr. Conte cites ('708 patent at 5:47-50) describes a subsequent step in the sequence (connecting to a content managing server) that occurs after the user's initial request. '708 patent at 5:40-50, Fig. 3. In other words, that passage describes only what happens after the content information providing request, it does not define how the content information providing request is made. The relevant disclosure shows that the request is a user request on the navigation device. '708 patent at 4:13-22, 6:9-25, Fig. 4. Thus, in my opinion, a POSITA reading the specification as a whole at the time of invention would have understood from the only embodiment provided in the specification that the "content information providing request" is a user request.

84. In my opinion, for the reasons above, a POSITA would have understood "in response to a content information providing request" to mean "in response to a user request on the navigation device to provide content information."

**D. "the content provider's server" ('708 claims 1, 6)**

85. In my Opening Declaration, I opined that the term "the content provider's server" renders claims 1 and 6 indefinite because a POSITA would not be able to discern the scope of the claims with reasonable certainty. Opening Declaration ¶¶ 98-112. I have reviewed Dr. Conte's contention on this term, and it does not change my analysis. Conte Decl. ¶¶ 53-58.

86. Dr. Conte appears to agree that "the content provider's server" lacks antecedent basis. *See id.* Dr. Conte also appears to agree, as he must, that this term does not appear in the specification. *See id.* However, Dr. Conte opines that, a POSITA "could have readily ascertained" the scope of this term. I disagree. In my opinion, Dr. Conte's analysis ignores the lack of any previous reference in the claim that might provide context or meaning, the fact that this term is surrounded by confusingly similar terms, and the fact that this term never once mentioned outside of the claims.

87. Without a definition from the specification to rely upon, Dr. Conte instead relies exclusively on extrinsic evidence from a dictionary definition to support his opinion. Conte Decl. ¶ 54. In my opinion, even the dictionary definition ("[a] server that stores online content") does not clear up any ambiguity and does nothing to distinguish it from the "content managing server," which also appears in the claim, along with "the content providing service" (which also lacks antecedent basis). '708 patent, claims 1, 6. Neither the claims nor the specification explain the relationship between "the content provider's server" and those other servers and services. Dr. Conte also opines that the claims and specification "clearly distinguish" the "content provider's server" from the "content managing server." Conte Decl. ¶ 56. Dr. Conte appears to be offering a tacit construction that the "content provider's server" must be different from the "content managing server." Conte Decl. ¶ 56 (the servers "cannot be one and the same"). But Dr. Conte also states that "a POSITA would have known that the content providers include a content managing server." Conte Decl. ¶ 56. Thus, even while attempting to distinguish the two concepts, Dr. Conte conflates the terms, which underscores the ambiguity that renders the term indefinite.

88. Dr. Conte also opines that Apple's mapping of this term to the prior art in Apple's EPR request somehow precludes an indefiniteness argument here. Conte Decl. ¶ 57. However, I am informed that the Patent Office construes the claims according to their broadest reasonable interpretation in an ex parte reexamination request. Applying the EPR broadest reasonable interpretation claim construction standard, Apple identified prior art servers falling within any plausible reading of the term, which is the opposite of conceding a single ascertainable claim scope. Ans. Br., Ex. C at 47 (identifying Wong's traffic database server as "content provider's

server"), 59-60 (identifying traffic database server as "content managing server"). Apple's EPR arguments thus do not undercut its indefiniteness arguments here.

89. Thus, in my opinion, this term renders the claims indefinite.

## IX. CONCLUSION

90. This Reply Declaration constitutes my reply opinions regarding the claim construction issues identified herein. I reserve the right to supplement or amend my opinions based on any additional briefing, evidence, or testimony that may be submitted in this matter, including but not limited to testimony or opinions presented at the *Markman* hearing.